UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
HELENA DIVISION

| | | |
|---|---|---|
| JOHN CAMPBELL MCTIERNAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CV-18-91-H-SEH |
| | ) | |
| FIRST INTERSTATE BANK | ) | |
| and | ) | |
| MARLIN NORLING | ) | |
| and | ) | |
| RANCH MARKETING ASSOCIATES, LLC | ) | |
| | ) | |
| Defendants. | ) | |

# COMPLAINT

Plaintiff, John C. McTiernan alleges as set forth below.

## PRELIMINARY STATEMENT

**1.** "I believe that banking institutions are more dangerous to our liberties than standing armies." - Thomas Jefferson.

**2.** This Complaint involves the fraudulent and misleading actions of First Interstate Bank (FIB), a bank that baited John McTiernan into believing it was going to extend his revolving line of credit at a commercially reasonable rate. Instead, FIB capitalized on its misrepresentations and implemented a scheme to drain all of McTiernan's cash reserves and ultimately seize his ranch at a depressed value. FIB went so far as telling McTiernan that if he did not sell his ranch, it would foreclose and keep all of the equity in the property, approximately $5,000,000.

**3.** As a result of the Defendants' collective and individual actions, Plaintiff has suffered direct out-of-pocket losses well in excess of $5,000,000.

## PARTIES

**4.**     The Plaintiff, John Campbell McTiernan, (hereinafter "McTiernan") is an adult domiciled in Sheridan County, Wyoming.

**5.**     The Defendant, FIB, is a banking institution conducting business in the State of Wyoming with an office located at 1401 W. 5th St., Sheridan, WY 82801. FIB is a bank with its principal place of business located in Billings, Montana. FIB's registered agent for service of process is Corporation Service Company at an address of 26 W Sixth Ave, Helena, Montana 59624-1691, United States.

**6.**     The Defendant, Marlin Norling, (hereinafter "Norling"), is an adult resident of the State of Wyoming and at all times material hereto was an agent and employee of FIB. Norling was an Assistant Vice President of FIB. Upon information and belief Norling resides at 428 Independent Ln., Sheridan, WY 82801-4518.

**7.**     The Defendant, Ranch Marketing Associates, LLC (hereinafter "RMA") is a real estate sales agency doing business in Montana, Wyoming and surrounding states. RMA is foreign limited liability company with its principal office located at 18501 CR 13, Johnstown, CO 80534. RMA's registered agent for service of process is Mathew J. Johnston, 157 Tongue River Canyon Rd., PO Box 7284, Sheridan, WY 82801.

## JURISDICTION

**8**.     This Court has personal jurisdiction over Defendants because they transacted business during the relevant period and have transacted business in this District.

**9**.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391 § (b)(1) and (c)(2).

## FACTS

10. The Padlock Ranch (hereinafter "Padlock"), is located in both Wyoming and Montana and is a 475,000 acre ranch owned by the Scott Family (hereinafter the "Scotts").

11. The Scotts are the majority and controlling owners of FIB. According to FIB's website, the Scotts are FIB's "principal stockholders."

12. Much like the land barons of yesteryear, the Scotts and the Holding family of Salt Lake City, Utah, have worked cooperatively for two decades using access to and control of credit to amass adjoining properties in Wyoming and Montana that now exceed the size of the State of Rhode Island.

13. McTiernan was the owner of the Bear Claw Cattle Ranch (hereinafter "Ranch"), which is a 3,000-acre ranch located in Dayton, Wyoming. The Ranch is almost completely surrounded by the Padlock and/or other property owned by the Scotts.

14. FIB offered McTiernan a "revolving line of credit" on the Ranch. FIB and the Scotts' motivation was to seize the Ranch from McTiernan and the five-year revolving line of credit was the seed to that plan. Despite numerous representations to the contrary, FIB had no intention to renew or modify any loan it offered to McTiernan. FIB and the Scotts anticipated that by the time McTiernan discovered the bank's deceitful plan, it would likely be too late for McTiernan to find alternative financing when the revolving line of credit matured in 2012. In 2012, when the Note matured, FIB would decline to renew it. FIB then planned to seize the Ranch in order to allow the Scotts to add the surrounding portfolio of property owned or controlled by the Scott and Holdings families.

15. As one local banker commented, "It's scary that McTiernan just gave a mortgage to the family that owns all of the Property around the Ranch." McTiernan entered the transaction

in good faith and expected and anticipated that FIB would treat him with the standards of good faith and fair dealing expected of those in the lending industry.

16.    On August 9, 2007, FIB issued a revolving line of credit to McTiernan in the amount of $5.5 million. Initially, McTiernan only drew $4.5 million to pay off his then-existing notes to Thornburg Mortgage and Homecomings Financial. The revolving line of credit was evidenced by a Note and secured by a Mortgage on the Ranch, a commercial security agreement, a commercial pledge agreement and a business loan agreement. The Note contained a variable interest rate provision, "resulting in an initial rate of 8.000% annum."

17.    The variable interest rate was based on the prime rate and eventually dropped to 3% in 2009 where it remained for three years until 2012 when FIB almost tripled the interest rate to 8%.

18.    In 2011, on two separate occurrences, McTiernan attempted to access the revolving line of credit. With no legal justification, FIB denied McTiernan's ability to access the funds or draw on the account by Norling, even though funds were available. Norling denied McTiernan access to the line of credit but could not explain why McTiernan was not able to draw on the line of credit, despite that fact that there were funds available to be drawn against. FIB's plan to bleed McTiernan dry and seize the Ranch was taking shape.

19.    No later than early 2010, it became common knowledge that McTiernan was facing a possible short period of incarceration. [McTiernan was sentenced to 4 months incarceration in 2006. He appealed and was subsequently sentenced to 12 months incarceration in October 2010. This was known to FIB.] Knowing this, in 2010 Norling suggested that McTiernan set aside a "year of interest payments". McTiernan complied with Norling's request and set aside one year of

interest payments. McTiernan informed Norling and FIB that he did in fact set aside one-years' worth of interest payments in the event he was incarcerated.

20. With the knowledge that McTiernan had set aside enough funds to make interest payments for one year in the event he was incarcerated, FIB and Norling set out to seize all of those funds as opposed to allowing McTiernan to use them for their intended purpose – making debt service payments at the Note rate.

21. As early as November 2011, McTiernan provided Norling and FIB copies of his tax returns, personal financial statements and all other information requested to support a modification/extension of the Note. As requested by FIB, McTiernan provided this information so as to extend the Note's maturity date because the Note was scheduled to come due in August 2012. In November 2011, Norling repeatedly assured and represented to McTiernan that it would not be a problem to extend the balloon payment date and provide McTiernan financing at market rates. McTiernan relied on the same.

22. On January 11, 2012, McTiernan met with Norling at FIB and provided Norling with an updated personal financial statement. In the meeting, Norling again represented to McTiernan that it would not be a problem to extend the balloon payment date and provide McTiernan financing at market rates. There was no mention from Norling or FIB of refusing to extend/modify the revolving line of credit or calling the Note due. In fact, the representations were to the contrary.

23. As of January 11, 2012, McTiernan had not missed an obligation thereunder and relied on Norling's representation that there would be no issue extending the balloon payment date and allowing McTiernan to pay market interest rates. As a result of Norling's representations, which McTiernan relied upon, McTiernan discontinued inquiries into alternative financing.

**24**.     Again, in early 2012, Norling represented that the bank would extend the balloon payment, the terms of the 2007 Note would be continued and the balloon payment would be pushed out some time into the future. In early 2012, McTiernan was paying 3% interest pursuant to the Note. Throughout multiple meetings with Norling, McTiernan confirmed his ability to continue to make the monthly payments with no interruption. As a result of Norling's statements that the Note would be extended or modified at current interest rates, an appraisal was ordered.

**25**.     In reliance on the representations of Norling, McTiernan stopped seeking alternative financing, McTiernan concentrated on assuring all future interest payments could be made. The hook was set.

**26**.     During this process, McTiernan disclosed that he owed the IRS a small tax debt and had arranged for a payment plan with the IRS for tax obligations. FIB accepted those arrangements.

**27**.     On February 14, 2012, Norling suddenly demanded paying off the IRS immediately by using the revolving line of credit he had previously denied McTiernan access to. Additionally, Norling further suggested that McTiernan sign over his deceased mother's estate and that the monthly payments to FIB be increased by the amount McTiernan was then paying monthly to the IRS. Norling and FIB conditioned any advance on the revolving line of credit on: (1) the monthly payments to FIB being increased by the amount McTiernan was then paying monthly to the IRS; and (2) "Procure a claim to FIB on John's [McTiernan] mother's estate." Neither of the above were contractual conditions to advances under the revolving credit note. These were simply additional demands of FIB that were never part of any loan conditions. These conditions were part of the scheme to take the Ranch from McTiernan.

**28**.     IRS payment plans involve placing a lien on real property. Apparently out of concern that a lien would have been placed on the Ranch, on February 22, 2012, Norling, on his

own accord**,** again offered access to the revolving line of credit which FIB had previously denied McTiernan access. FIB and Norling were seeking to increase McTiernan's monthly payment and secure a security interest in McTiernan's deceased mother's estate. With the IRS lien removed, the Ranch became a clear target for seizing as now FIB and the Scotts would not have to deal with the IRS.

29.     On April 30, 2012, McTiernan met with FIB and Norling to discuss the status of a loan extension or modification. Norling again told McTiernan that a loan extension or modification would be offered at a market rate. Norling told McTiernan not to worry as an extension would not be a problem. Norling did not tell McTiernan and gave no indication to McTiernan that the loan would not be extended or modified. In April 2012, McTiernan had an exemplary credit score, had made all payments to FIB due under the Note, had provided FIB with information indicating he had set aside twelve-monthly payments in the event he was incarcerated, and could continue to make the debt service payments under the Note with ease.

30.     On May 24, 2012, McTiernan was informed that FIB had hired Brent Brooks (hereinafter "Brooks") of Sheridan to conduct an appraisal of the Ranch. Upon information and belief, Brooks was contracted to perform residential appraisals for FIB. Furthermore, Brooks was not qualified to appraise a complex piece of property such as the Ranch which has sophisticated conservation easements, water rights, and state leases that affect its value. Brooks was inexperienced and had never performed an appraisal on a Ranch the size of the Bear Claw Ranch. Additionally, in light of Brooks' extensive employment history with the Padlock and the Scotts, Brooks was not an impartial appraiser.

31.     In June 2012, Brooks appraised the Ranch and valued it at approximately $8,930,000.00, which equates to around $3,100/acre. In June 2014, Brooks reappraised the Ranch

and valued it at $8,950,000. In 2006, a previous appraisal was performed that valued the Ranch at over $1,000,000 more than Brooks' 2012 appraisal. The 2006 appraisal valued the land at approximately $3,600/acre. Brooks' appraisals are difficult to comprehend as ranch land in Wyoming had appreciated in value from 2006 through 2012 and later through 2014. Upon information and belief, Brooks was instructed to deflate the appraisal to assist FIB in encouraging McTiernan to sell the Ranch at a below market price to the Scotts or an associate thereof.

32.     The Ranch was subsequently acquired by Ross Matthew. Upon information and belief, Ross Matthew is married to Kathleen Holding, a known associate of the Scotts. Ms. Holding – Matthews and her family are friends of the Scotts and, upon information and belief, have conspired together to take control of other nearby ranch properties.

33.     After the 2012 appraisal was performed, McTiernan requested a copy of it. However, FIB refused to provide a copy of the appraisal to McTiernan.

34.     In June 2012, Norling, for the first time and in direct contravention with his previous representations, told McTiernan that the loan would not be extended or renewed at the then-existing 3% interest rate. Rather, FIB, through Norling, indicated that the interest rate would be increased to the default rate of 8%, with the balloon payment being extended only four months until December 2012. Norling blatantly fabricated and communicated to McTiernan that the "Feds" would not allow FIB to hold an interest-only loan and that federal guidelines would not allow modification of the Note.

35.     This was the first time that FIB or Norling had shared with McTiernan that it would not continue the loan under the same terms and would begin charging 8% interest under any agreement. Further, this was the first time Norling or FIB concocted the story that federal guidelines would not allow modification of the Note. This was also the first time FIB or Norling

informed McTiernan that only a short-term extension could be granted, despite previous discussions regarding longer extensions. All of these new representations were in direct contravention to FIB's previous representations, including an express representation that FIB would renew the loan for an additional five-year term and on similar terms.

36.     The timing was designed to give McTiernan little or no time to seek alternative financing and in fact, McTiernan was not able to arrange substitute financing.

37.     McTiernan's reliance on Norling and FIB's representations was reasonable.

38.     FIB and Norling strung McTiernan out long enough, from 2011 through June 2012, with their misrepresentations as to the status of modification/renewal that McTiernan had lost almost all ability to seek financing elsewhere; FIB had McTiernan exactly where it wanted him.

39.     FIB intentionally and with purpose delayed the modification / renewal until June 2012, all the while affirmatively misleading McTiernan, to inform McTiernan of the new terms of an extension/modification. This was done in order to increase the interest rate to 8% and grab all of the cash that McTiernan had informed FIB he had set aside to service the loan at the Note interest rate as previously discussed and described by Norling. FIB and Norling continued to request information throughout the fall of 2012 under the guise that a loan extension/renewal could be obtained and then nearly tripled the amount of McTiernan's monthly payments. This effectively drained McTiernan's cash reserves he had set aside.

40.     When the Note came due on August 9, 2012, FIB and Norling refused to modify the note as promised and initiated their scheme to charge McTiernan 8% default interest and seize all of the funds McTiernan had set aside to make interest payments for twelve months in the event that he was incarcerated.

41. The misrepresentations detailed above and elsewhere in this complaint were negligent and / or intentional and constitute false promises.

42. Revolving lines of credit are routinely renewed in the lending industry. FIB refused to do so as its goal from day one was to seize the Ranch. FIB provided McTiernan no explanation as to why it would not renew the revolving line of credit and as stated earlier, it manufactured blatant lies concerning the federal government's position on the bank renewing revolving lines of credit. Banks renew revolving lines of credit as part of their normal course of business and renewing revolving lines of credit is considered to be an industry standard.

43. In October 2012, as a condition to discussing an extension/modification of the Note, FIB demanded that McTiernan enter into a listing agreement for the Ranch. FIB insisted that said listing agreement be with Ranch Marketing Associates, which was an entity that had an extensive and lengthy relationship with FIB.

44. On November 1, 2012, Norling demanded that McTiernan pay $8,500 for the cost of the June 2012 Brooks appraisal. Norling demanded this additional payment despite the fact that FIB had already assessed the costs of the appraisal against McTiernan's account. [Norling was already aware that McTiernan had set aside additional funds to make debt service payments should he be incarcerated. As part of the scheme, FIB sought to take control of those monies.]

45. On October 24, 2012, at the requirement of FIB, McTiernan entered into a listing agreement with RMA. RMA had an ongoing relationship with FIB at this time but the relationship between FIB and RMA was not disclosed to McTiernan until after the contract was signed. Only after the contract was signed did RMA's Matthew Johnson disclose his relationship with FIB.

46. Though RMA had, "fiduciary duties of utmost good faith, loyalty, and fidelity to [McTiernan]," it shared McTiernan's confidential information with FIB and a proposed buyer,

Ross Matthews, a member of the Holding family (hereinafter "Matthews"), to the detriment of McTiernan.

47.    A portion of the aforementioned 2012 appraisal that FIB refused to share with McTiernan was part and parcel of the offer received from Matthews. Matthews unquestionably obtained the appraisal from FIB as FIB was working with Matthews behind the scenes to assist Matthews in seizing the Ranch at a depressed value.

48.    On December 17, 2012, Norling encouraged McTiernan to sign a "Change in Terms Agreement." This Change in Terms Agreement included numerous provisions that previously did not exist and all of which benefited FIB to McTiernan's detriment.

49.    As a condition to FIB executing the Change in Terms Agreement, Norling demanded that McTiernan pay $8,500 for the 2012 Brooks appraisal that FIB had charged against McTiernan's revolving line of credit six months earlier.

50.    As a condition to FIB executing the Change in Terms Agreement, Norling demanded that McTiernan pay an additional $7,795.10 in addition to the $27,253.28 he had already paid in December 2012.

51.    The Change in Terms Agreement also included a provision that FIB referred to as an incarceration clause. This clause provided that if McTiernan was incarcerated during the repayment period, he would be in default.  McTiernan informed Norling that he did not feel comfortable signing a Change in Terms Agreement that included an incarceration clause. Norling's response was that either McTiernan sign the Change in Terms Agreement as it was written or FIB would initiate a foreclosure action that same day.

52.     The above actions amount to economic duress and extortion. McTiernan was placed in an impossible position. Face immediate foreclosure – one manufactured by FIB – or agree to an incarceration clause which would give FIB the right to foreclose.

53.     McTiernan requested that the incarceration clause ("if the customer is incarcerated for any period of time") wording be removed from the Change in Terms Agreement. Norling responded that FIB would do so only if McTiernan paid an additional $160,000 to pay down the line of credit.

54.     The incarceration clause is essentially an anticipatory breach clause and FIB knew that McTiernan was likely facing a short period of incarceration.  FIB included the anticipatory breach incarceration clause in the Change in Terms Agreement for the sole purpose of increasing the interest rate to 11% after McTiernan was incarcerated and therefore, FIB could declare a default. This would further tighten FIB's grip on McTiernan. The 11% charged by FIB however was not contemplated in the Change in Terms Agreement and is in direct contravention of the same.

55.     When it was determined McTiernan would be required to serve an eleven-month prison sentence, Norling immediately emailed an article to McTiernan stating he needed to discuss this situation. However, McTiernan had not missed a single payment to FIB and had complied with every request of FIB, including setting aside one year's worth of payments for when he was going to be incarcerated.

56.     Finally, the Change in Terms Agreement raised the interest rate of the Note, even though Norling and FIB had repeatedly told McTiernan the interest rate would be decreased. Nothing in the Change in Terms Agreement allowed FIB to add a 5% default interest rate to the base rate.  When McTiernan was incarcerated, FIB added a 5% default rate to the 6% set forth in

the Change in Terms Agreement and began to, and has to this date, assess an 11% interest rate that is not supported by any of the loan documents. FIB has used an unsupportable "sleight of hand" contract interpretation to impermissibly charge McTiernan over $600,000 I additional interest.

57. The December 21, 2012 Change in Terms Agreement was nothing more than a bait and switch, wherein FIB represented that it was dropping the then-controlling interest rate from 8% to 6%, but in reality, FIB was attempting to raise the interest rate so that when the six-month extension period ended or when McTiernan was incarcerated, it could charge 11%.

58. On December 21, 2012, FIB forced McTiernan to sign the Change in Terms Agreement to avoid FIB initiating a foreclosure. It is undisputed that as of December 21, 2012, McTiernan had made all payments due under Note, including the default interest FIB was charging.

59. Despite McTiernan's requests, RMA refused to market the Ranch internationally. It simply marketed the Ranch locally, which created a micro market for the Ranch and virtually assured that all people who made offers were local and FIB and the Scotts would be aware of the offer. To gain further information, FIB and Norling communicated directly with RMA to stay abreast of all potential sales activity.

60. On February 11-12, 2013, McTiernan, via his wife, authorized Norling to deduct $26,250 for the February interest payment from one of his deposit accounts, but without permission and authorization to do so, Norling chose to deduct $27,162.

61. FIB and Norling immediately seized on McTiernan's misfortune by declaring a default pursuant to the incarceration clause.  FIB then began to charge interest on the loan at 11% despite the fact that the contractual documents only allowed FIB to charge an interest rate of 6%.

**62**.     As a result of the interest rate scheme perpetrated by FIB, McTiernan has been assessed over $600,000 in interest that FIB has no contractually right to assess.

**63**.     On March 18, 2013, Norling forwarded an email to McTiernan's wife informing her that in order for FIB to consider an extension of the Note, McTiernan had to come in with an almost $140,000 payment. As of March 18, 2013, McTiernan had not missed a single payment to FIB.

**64**.     On April 3, 2013, McTiernan surrendered to federal prison to begin serving his eleven-month sentence.

**65**.     On April 8, 2013, Norling encouraged McTiernan's wife to sell McTiernan's past movie residuals to make further payment to the Bank.

**66**.     On April 9, 2013, six days after McTiernan's incarceration began, Norling and FIB encouraged McTiernan's wife to draw money from McTiernan's deceased mother's estate account to pay FIB.  However, McTiernan had never missed a payment to FIB.

**67**.     On April 24, 2016, Norling again inquired as to receiving funds from McTiernan's mother's estate. Specifically, Norling questioned how quickly and how much money FIB could expect from the Estate funds, even though FIB had no legal interest to the funds. Norling also inquired as to any retirement accounts McTiernan had that could be accessed to pay FIB. Again, McTiernan had never missed a payment to FIB.

**68**.     On June 21, 2013, Norling informed McTiernan that, despite the fact that he had never missed a payment at the 8% default rate, or the 6% rate agreed upon in the Change of Terms Agreement, the Note was accruing interest at a rate of 11%.  FIB had no contractual or other right to accrue interest at a rate of 11% and despite the same, has continued with that position and represented the same to the Bankruptcy Court. FIB only entered into the Change in Terms

14

Agreement to support its frivolous position that interest should accrue at 11%, causing a $600,000 windfall to FIB.

69.    On or about June 14, 2013, Ross Matthews ("Matthews") made an offer to purchase the Ranch for $7,300,000. Upon information and belief, Matthews was aware of Brooks' deflated 2012 appraisal of the Ranch and the dire straits FIB had placed McTiernan in. In fact, Matthews' offer included a page from Brooks' 2012 Appraisal that FIB had refused to share with McTiernan.

70.    FIB worked closely with Matthews and shared private protected information about McTiernan and the status of the Ranch in an effort to allow Matthews to purchase the Ranch at a deflated value.

71.    FIB worked with Matthews in an attempt to hide its efforts to deflate the value of the Ranch so that the Ranch could be acquired at a price far below market rate.

72.    On June 19, 2013, Norling and FIB inserted themselves into the compelled sale of the Ranch and instructed McTiernan to return RMA's messages. Further, Norling and FIB told McTiernan to respond to the June 14, 2013, Matthews offer.

73.    On June 21, 2013, Norling informed McTiernan that if the June 30, 2013, payment was not made, FIB would resume foreclosure proceedings. Norling also threatened McTiernan with the "advice" that if the monthly payment was not made by June 30, 2013, the foreclosure proceeding would have a "significant downward effect" on the market price of the Ranch. Norling was providing the same information to Matthews in an effort to force McTiernan to sell the Ranch at an amount far under market value, with the ultimate result being that the Scotts and Padlock would obtain the Ranch for a below market price.

74.    On June 24, 2013, Norling, in an attempt to further intimidate McTiernan and force him to sell to Matthews/Scott/Padlock at a depressed value, requested to visit McTiernan in federal

prison. Norling was fully aware that Gail McTiernan was acting as McTiernan's power of attorney and had full authority to act on his behalf.

75.    On June 25, 2013, Norling insisted the McTiernan counter Matthews' offer and fraudulently threatened, "If there is not another buyer and no refinancing brewing, I am afraid you will run out of options and the time and this bank will begin foreclosure. **If foreclosure runs its course, any equity in the ranch goes to the bank, not the McTiernans – ask any local attorney.**" Norling was attempting to force McTiernan to sell to Matthews at a depressed value and/or continue to pay FIB excessive interest through fear and economic duress.

76.    On June 27, 2013, Norling instructed McTiernan to "work to make a sale happen." Again, Norling was trying to force McTiernan to sell to Matthews/Scott/Padlock.

77.    On July 1, 2013, Norling accessed McTiernan's ex-wife's bank account and then informed McTiernan that she had bounced several checks.  Norling continually monitored all of McTiernan's accounts and apparently those of individuals with connections to McTiernan. Norling was a foot solider executing the scheme to seize the Ranch and keeping tabs on McTiernan and all those connected to him.

78.    On July 15, 2013, Norling demanded that Gail McTiernan update him on the status of the listing.

79.    On August 8, 2013, McTiernan's attorney informed Norling that he was working on the fine details for a counteroffer to the Matthews/Scotts – FIB was conditioning any abeyance from the foreclosure on a signed purchase agreement.  Norling informed McTiernan's attorney that "[FIB] defines an acceptable offer as a Purchase Agreement with meaningful down payment signed by both an able buyer and seller with an agreed upon amount with reasonable terms which both parties appear able to exercise on the loan collateral for a sufficient amount to pay off the real

estate mortgage principal, interest and protective advances allowed by the mortgage."  Norling was attempting to force McTiernan to accept an offer from Matthews/Scotts far below market value and using the threat of foreclosure to attempt to accomplish the same.

80.     At this time, McTiernan asked for the 2012 Brooks appraisal but was told he could not have it since he did not pay $8,500 for it.  Yet, the $8,500 was previously charged against the line of credit and thus paid.

81.     In August of 2013, RMA refused to insert the changes requested and suggested by McTiernan's lawyer into the counteroffer to the Matthews/Scott.

82.     Norling was well aware of all negotiations between McTiernan and the Matthews concerning the sale of the Ranch.  McTiernan was not the source of the information; the information came directly from Matthews or RMA.

83.     On August 15, 2013, RMA forwarded the McTiernan's counteroffer offer to Matthews'/Scotts' real estate agent but failed to make the six changes he was instructed to make by McTiernan's wife.

84.     Norling put further pressure on McTiernan when in an email he demanded a signed acceptance of the Scott / Matthews offer or a first mortgage on two other parcels of nearby land.

85.     On August 17, 2013, Matthews/Scott asked for an extension until September 10, 2013, to respond to McTiernan's counter-offer.

86.     On August 21, 2013, Norling informed McTiernan's counsel that FIB would not be extending forbearance and would be initiating foreclosure.

87.     On August 26, 2013, Norling called McTiernan's counsel and stated if McTiernan did not pay $26,000, FIB would begin preparing foreclosure paperwork. At the same time, Matthews asked for a short extension to consider McTiernan's counteroffer. Therefore, in order

for McTiernan to get a response to the counteroffer from Matthews, he was required to pay FIB $26,000.

88.     FIB's counsel, Lori McMullen, recognized in writing that the appraisal performed by Brooks was low, but that did not deter Norling, FIB, or Matthews from attempting to force McTiernan to sell the Ranch at a depressed value to Matthews/Scott. McMullen admitted that the appraisal was outdated, and that FIB understood that the offers that had come in were well below the appraisal's value and even included parcels not included in the appraisal.

89.     McMullen also agreed that real estate prices in the Sheridan area had appreciated since the Brooks appraisal. McMullen informed McTiernan's counsel that FIB would move forward absent "positive information on the efforts to sell the Ranch." FIB was fully aware that the only buyer sniffing around was the Matthews/Scotts, likely because RMA refused to market the Ranch internationally.

90.     On September 27, 2013, McMullen authored an email to McTiernan's counsel stating FIB "would cancel the foreclosure proceedings if it is presented with a bona fide, signed purchase agreement in an amount that would be at least sufficient to insure payment of the McTiernan mortgage indebtedness on the property." McMullen and FIB understood that the only purchaser on the map were the Matthews/Scotts and again attempted to force McTiernan to sell the property to the same at a depressed value under the threat of economic duress.

91.     After forcing McTiernan to prepare for a bankruptcy filing to protect his equity in the Ranch because Norling had informed him that FIB would receive all of the equity upon a foreclosure proceeding, FIB again offered a forbearance agreement, but now inserted a provision that required McTiernan to sign a deed in lieu of foreclosure. This was done to allow the Scotts

and the Padlock to avoid a messy foreclosure or a bankruptcy proceeding, and it would allow them to simply take the Ranch along with millions in equity that rightfully belonged to McTiernan.

92.    Ultimately, McTiernan filed bankruptcy on October 18, 2013.  FIB's fraudulent scheme has continued throughout the bankruptcy.  FIB continued to represent it was entitled to 11% interest when there is no such right under the Loan Documents.  FIB has bamboozled the Bankruptcy Estate and McTiernan out of over $600,000 in unearned interest.

93.    Upon information and belief, FIB, the Scotts and Matthews have used the same tactics to seize hundreds of thousands of acres of Property in both Wyoming and Montana over the last twenty years.

## COUNT ONE
### (Breach of Contract)

94.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

95.    As set forth above, McTiernan, FIB and RMA were parties to a series of contracts ("Loan Documents") and a listing agreement.

96.    McTiernan performed all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the Loan Documents and the listing agreement.

97.    FIB and its agents breached the Loan Documents by way of the conduct described in detail above, specifically charging an 11% interest that is not contemplated by or allowed by the Loan Documents.

98.    RMA and their agents breached the listing agreement by way of the conduct described in detail above, specifically sharing McTiernan's information with both Matthews and

FIB and working in concert with FIB, whom RMA had a relationship with to force McTiernan to sell the Ranch at a depressed value.

99.    As a direct and proximate result of FIB and RMA's numerous and repeated breaches of the Loan Documents, McTiernan has been and continues to be damaged in an amount to be proven at trial based on the facts alleged herein including, but not limited to, interest, costs and attorneys' fees, and the loss of millions of dollars of equity in the Ranch.

## COUNT TWO
### (Economic Duress)

100.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

101.    FIB and Norling continually threatened McTiernan with actions they were not entitled to take, including charging an 11% interest rate, instituting a foreclosure proceeding resulting in a sale of the property after they created a default, and telling McTiernan that FIB would be "keeping all of the equity" in the property if it foreclosed.

102.    As alleged herein, McTiernan was never in monetary default and met all of FIB's demands for interest even though FIB was not entitled to receive such interest.  Nevertheless, FIB continually threatened to initiate foreclosure proceedings and keep all of the equity in the McTiernan's property, which was at least $5 million at the time the aforementioned conduct started in 2012.

103.    Additionally, FIB forced McTiernan to sign the Change in Terms Agreement, under the pretense that it was helping McTiernan, when in reality FIB and Norling were positioning to charge McTiernan the impermissible 11% interest rate.  Further, FIB and Norling forced McTiernan to sign the Change in Terms Agreement, which included an incarceration clause, when FIB and Norling understood that McTiernan was going to report to prison.  If McTiernan did not

take the compelled actions, FIB and Norling threatened to initiate foreclosure proceedings and seize all equity in McTiernan's property.

**104**.    McTiernan was placed in a position where he feared that if he did not comply with FIB and Norling's demands, FIB would not only initiate foreclosure proceedings, but would also continue to assess interest at the impermissible rate and run up excessive "fees" and default interest, and based on Norling's representation, ultimately seize the millions in equity in the Ranch that rightfully belonged to McTiernan.

**105**.    FIB's actions constituted extortion and its actions were not made in good faith but were made in an attempt to force McTiernan to pay excessive interest rates, strip McTiernan of all cash and seize all of McTiernan's equity in the Ranch. All of these would cause a windfall to FIB and allow the Scotts/Matthews to obtain the Ranch, despite the fact that FIB was over collateralized at all times and McTiernan had provided proof of funds to continue to make interest payments at the Note rate as promised by FIB and Norling.

**106**.    McTiernan had no choice but to comply with FIB's demands and did so.

**107**.    Under the circumstances alleged herein, McTiernan had no other alternative but to accept the terms forced upon him by FIB.

**108**.    The circumstances surrounding McTiernan's involuntary acceptance of FIB's terms were the result of FIB's coercive actions mentioned herein, including threatening to initiate foreclosure and seize all equity in McTiernan's Ranch.

**109**.    FIB's threats and actions were not based on a good faith belief that the security interest at issue was impaired or that McTiernan could not make debt service payments on the Note. Rather, the threats and actions were rooted in FIB/Scott/Matthew's economic self-interests,

including charging default interest at an impermissible rate, seizing the equity in the Ranch and seizing the Ranch at a depressed value.

110.    FIB continually and persistently extracted additional benefits and agreements from McTiernan while providing no additional consideration for said benefits.

111.    FIB's actions deprived McTiernan of his unfettered free will to operate his Ranch and pay its debts as it had contracted to do.

112.    McTiernan was continually and persistently required to give something up for nothing, in the complete absence of any additional consideration, in order to protect his homestead and keep FIB, the Scotts and Matthews at bay.

113.    As a direct and proximate result of the above and the other allegations contained in this Complaint, McTiernan suffered substantial economic damages in the form of, *inter alia,* default interest, attorney's fees and ultimately the loss of millions of dollars of equity in the Ranch.

## COUNT THREE
### (Breach of Fiduciary Duty)

114.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

115.    At all relevant times, there was a unique condition of trust and confidence between McTiernan and FIB/Norling as well as between McTiernan and RMA. By virtue of that relationship, FIB and RMA owed McTiernan a fiduciary duty.

116.    FIB provided retirement planning services for McTiernan and his closely held entities and even served as the administrator of at least two retirement plans including for the entity operating the Ranch. Norling also provided advice on running the ranch and cattle and hay prices, services that are not indicative of the normal lender – borrower relationship. As such, FIB owed McTiernan a fiduciary duty to always act in his best interest.

**117**.    FIB and Norling compelled McTiernan to hire RMA as realtor to list the Ranch as a precondition to the Change in Terms Agreement and instituted themselves into the sale process by advising McTiernan on the sales process.

**118**.    FIB forced McTiernan to hire RMA - whom were insiders or agents of FIB and were dispatched to control the sales process of the Ranch and provide inside information to FIB and Matthews.

**119**.    McTiernan did not consent to any of FIB's acts of control but was ultimately compelled to succumb to such control under duress.

**120**.    FIB continually and systematically used coercion and duress to ensure that McTiernan did what FIB wanted.

**121**.    FIB's actions went far beyond simply providing a line of credit to McTiernan; FIB and Norling continually offered advice and consultation. FIB and their representatives blended the line of a typical lender/borrower relationship and took on a fiduciary responsibility in the following ways: 1) Norling advised McTiernan to set aside a year of interest payments in the event of his incarceration. 2) Norling expressed to McTiernan multiple times that there would not be any issues extending the balloon payment date thus providing faulty assurances to McTiernan. 3) Norling advised McTiernan to sign over his deceased mother's estate and that the monthly payments to FIB would be increased by the amount McTiernan was then paying to the IRS. 4) Norling communicated to McTiernan incorrect advice regarding federal guidelines regarding note modifications. 5) Norling gave advice regarding market price standards and foreclosure deadlines. 6) Norling offered knowingly fraudulent advice regarding foreclosure procedures and who would receive equity in the ranch. 7) Norling provided advice to McTiernan on the business aspects of operating the Ranch and held himself out as an experienced rancher.

**122**.    At all relevant times, FIB and its agents were placed in a position of trust and responsibility relative to: (a) administration of the Note; (b) providing advisory services to McTiernan in regard to the sale of the Ranch and the modification/refinancing of the Note; and (c) handling of McTiernan's sensitive financial information.

**123**.    At all relevant times, FIB and its numerous agents and employees knew or should have known that they were providing sophisticated business services to McTiernan, and that McTiernan was uniquely vulnerable to economic harm and detriment which would surely arise should FIB and Norling improperly utilize their positions of power and authority.

**124**.    At all relevant times, McTiernan placed his trust and faith in FIB/Norling and their various agents and employees, thereby developing a special and privileged relationship, which created a duty of care and fiduciary duty owed by FIB and their agents to represent the interests of McTiernan.

**125**.    FIB and its numerous agents and employees held and owed McTiernan fiduciary duties and obligations related to McTiernan's business affairs precisely because McTiernan entrusted these Defendants with personal information when said Defendants were providing advice and promises in regard to the Note and revolving line of credit.

**126**.    FIB, Norling and their agents and employees breached their fiduciary duties and obligations to Plaintiff by pursuing their own economic self-interests to the detriment of the Plaintiff.

**127**.    RMA contractually agreed to a fiduciary relationship with McTiernan and breached the same when it shared sensitive, private information with both FIB and Matthews. RMA breached its duty of loyalty to McTiernan when it took the actions mentioned herein, including but

not limited to, refusing to place terms in counteroffers and refusing to market the ranch internationally.

128.    As a direct and proximate result of the breach of fiduciary duties by the Defendants and their agents and employees, McTiernan has been, and continues to be, damaged in an amount to be proven at trial based on the facts alleged herein including, but not limited to, interest, costs and attorneys' fees, and the loss of millions of dollars of equity in the Ranch.

## COUNT FOUR
### (Claim for an Accounting)

129.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

130.    FIB was in the exclusive position of collecting McTiernan's debt service payments, allocating said payments and assessing interest rates.

131. As a result of FIB being in the exclusive position of collecting McTiernan's debt service payments, allocating said payments, and assessing interest rates, McTiernan trusted and relied upon FIB.

132.    As detailed in Count Three, a business and fiduciary relationship existed between McTiernan and FIB.

133.    McTiernan is entitled to a complete and accurate accounting of all debt service payments made to FIB and the allocation thereof, from the inception of the Note at issue until the present, as a result of McTiernan's reliance upon FIB and the business relationship which existed.

## COUNT FIVE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

134.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

**135**.    McTiernan, FIB and RMA and their agents were parties to the loan documents and listing agreement respectively, under which McTiernan reasonably expected to receive certain benefits.

**136**.    McTiernan, FIB and RMA were required to take all actions that the Loan Documents and listing agreements presumed to accomplish and were required to take all actions to fulfill the purpose of the Loan Documents and listing agreements.

**137.**    McTiernan, FIB and RMA were under a duty not to take any action that would interfere with the other party's rights to receive the benefits of the Loan Documents and the listing agreement.

**138**.    McTiernan, FIB and RMA were required to deal with each other honestly and under reasonable commercial standards of fair dealing.

**139**.    FIB was vested with a vast amount of discretion in regard to the Note and the renewal and modification thereof and was required to exercise that discretion in a commercially reasonable fashion.

**140**.    FIB abused that discretion when it led McTiernan to believe that he would be offered an extension/modification of the Note at a market rate when it had no intention of doing so.

**141**.    FIB further abused that discretion by continually threatening foreclosure if McTiernan did not sell the Ranch to Matthews/Scott.

**142**.    FIB's improper interest rates and default rates were not contemplated by the Loan Documents and are in complete contravention of the Loan Documents.

143.    As articulated herein and above, FIB took advantage of McTiernan's vulnerability to extort a Change in Terms of the Note which changes attempted to force McTiernan to sell the Ranch at a depressed value. This Change in Terms would allow FIB to fraudulently and dramatically increase the default interest rate and allow FIB to obtain an illegal $600,000 windfall at McTiernan's expense.

144.    RMA shared McTiernan's confidential information with FIB and Matthews and failed to take actions McTiernan requested it take on his behalf, which was his right under the listing agreement.

145.    FIB's and RMA's conduct as articulated above, intentionally, willfully, and with reckless disregard, frustrated McTiernan's ability to receive the benefits contemplated by the Loan Documents and the listing agreement and ultimately stripped McTiernan of millions of dollars of equity in the Ranch.

146.    FIB, RMA and their agents maliciously and without justification engaged in the aforesaid conduct, injuring McTiernan's right to receive some or all of those benefits.

147.    FIB and RMA acted arbitrarily and capriciously in violating their duty of good faith and fair dealing, in additional to violating other loan documents and provisions, by way of the conduct described above and herein.

148.    As a direct and proximate result of the breach of good faith and fair dealing by the Defendants and their agents and employees, McTiernan has been and continues to be damaged in an amount to be proven at trial based on the facts alleged herein including, but not limited to, interest, costs and attorneys' fees, and the loss of millions of dollars of equity in the Ranch.

## COUNT SIX
## (Tort of Bad Faith)

149.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

150.    At the time the Plaintiff signed the revolving line of credit, he was in an inherently inferior bargaining position with FIB for all of the factual reasons previously state.

151.    The Plaintiff's motivation for entering into the line of credit with FIB was to provide him with financial peace of mind with his creditors when he was potentially entering a short prison stay.

152.    Ordinary contract damages are not sufficient because they do not require FIB and the other defendants in their superior position to account for their actions and they do not make the Plaintiff whole.

153.    The Plaintiff was especially vulnerable to FIB because of his situation with his potential prison stay and he put his faith in FIB to perform on its promises out of necessity.

154.    FIB was aware of this vulnerability on the Plaintiff's part and took advantage of this vulnerability to attempt to seize the Plaintiff's ranch.

155.    The actions, misrepresentations and omissions that constitute Defendants' breach of the covenants of good faith and fair dealing (Count Five above) were done in bad faith. As such they constitute the separate tort of Bad Faith.

## COUNT SEVEN
## (Fraudulent Concealment)

156.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

157.    FIB had a fiduciary duty to disclose all material facts relating to its plans with reference to the Note and revolving line of credit extended to McTiernan, including, but not limited to, its intention not to extend/modify the Note.

**158.** FIB breached this duty by failing to disclose and intentionally concealing from McTiernan material facts, including but not limited to, its plan to not extend/modify the Note and seize the Ranch despite its numerous representations to the contrary.

**159.** Upon information and belief, FIB knew, among other things, that by failing to disclose that it had no intention of extending/modifying the Note at commercial rates, McTiernan was acting upon incomplete, insufficient and incorrect knowledge when McTiernan relied on the same and ceased efforts to obtain alternative financing.

**160.** Upon information and belief, FIB knew that by concealing its intention to not extend/modify the Note and seize the Ranch that McTiernan was acting upon incomplete, insufficient and incorrect knowledge when McTiernan forestalled efforts to obtain alternative financing and later continued to pay default interest based on the representation that a modification would be offered.

**161.** Upon information and belief, FIB knowingly and intentionally did not disclose and took affirmative steps to conceal material facts relating to its scheme to mislead McTiernan in regard to the extension/modification in order to allow it to declare a default and charge default interest. Ultimately, when it had drained McTiernan's cash reserves, it would seize the Ranch at a depressed value, knowing full well that McTiernan would unwittingly cease seeking alternative financing and continue to pay uncontracted for default interest after FIB assured McTiernan an extension would be forthcoming.

**162.** McTiernan reasonably relied to his detriment upon the inferior, incomplete, and incorrect knowledge and information that was intentionally made available to him by FIB with respect to an extension/modification of the Note and therefore ceased efforts to obtain alternative financing and continued to pay impermissible default interest.

**163.**     As a direct and proximate result of FIB's fraudulent concealment, Plaintiffs have sustained substantial damages in an amount to be proven at trial based on the facts alleged herein including, but not limited to, interest, costs and attorneys' fees, and the loss of millions of dollars of equity in the Ranch.

## COUNT EIGHT
## (Intentional Misrepresentation)

**164.**     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

**165.**     Upon information and belief, FIB and Norling knew that its representations to McTiernan that it would extend/modify the loan at market rates were false, misleading and fraudulent statements of material fact and said statements were made to induce McTiernan to continue to make interest payments and fail to seek financing from another source.

**166.**     McTiernan reasonably believed the representations from FIB and Norling to be true, including but not limited to: (a) the revolving line of credit would be extended at commercial rates.

**167.**     McTiernan relied on the representations of FIB and Norling and because of the same, suffered substantial damages as set forth herein.

**168.**     As a direct and proximate result of FIB and Norling's intentional misrepresentations, Plaintiff has sustained substantial damages in an amount to be proven at trial based on the facts alleged herein including, but not limited to, interest, costs and attorneys' fees, and the loss of millions of dollars of equity in the Ranch.

## COUNT NINE
## (Negligent Misrepresentation)

169.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

170.     Upon information and belief, FIB and Norling should have known that its representations to McTiernan that it would extend/modify the loan at market rates were false, misleading and fraudulent statements of material fact and said statements were made to induce McTiernan to continue to make interest payments and fail to seek financing from another source.

171.     McTiernan reasonably believed the representations from FIB and Norling to be true, including but not limited to: (a) the revolving line of credit would be extended at commercial rates.

172.     McTiernan relied on the representations of FIB and Norling and because of the same, suffered substantial damages as set forth herein.

173.     As a direct and proximate result of FIB and Norling's negligent misrepresentations, Plaintiff has sustained substantial damages in an amount to be proven at trial based on the facts alleged herein including, but not limited to, interest, costs and attorneys' fees, and the loss of millions of dollars of equity in the Ranch.

## COUNT TEN
## (Violations of the Montana Unfair Trade Practices and Consumer Protection Act)

174.     McTiernan hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

175.     McTiernan brings this claim for violations of the Montana Unfair Trade Practices and Consumer Protection Act. ("MCPA"), Mont. Code Ann. § 30-14-101 *et seq*.

176.     The MCPA declares that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." M.C.A. 30-14-103.

177.     Section 30-14-102 of the MCPA prohibits unfair trade practices by entities engaged in "trade or commerce." "Trade or commerce" is defined as follows:

178.     "Trade" and "commerce" mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state.

179.     McTiernan is a consumer who entered into a credit transaction and utilized the services of the Defendants.

180.     Defendants, by providing loan and banking services, meet the definition of engaging in a trade or commerce under the statute.

181.     The Defendants made false and misleading statements to McTiernan concerning their relationship to the Ranch appraiser who was unqualified to appraise such a large estate.

182.     The Defendants intentionally concealed its communications with McTiernan or otherwise failed to disclose that the Lenders had a previous relationship with the appraiser until after the appraisal occurred.

183.     McTiernan reasonably expected that the Defendants, consistent with their representations would extend the revolving line of credit at commercial rates.

184.     Furthermore, FIB owed a fiduciary duty to McTiernan as it had overstepped the traditional boundaries of a lender/borrower relationship. FIB continuously provided unsolicited and blatantly incorrect advice to McTiernan; FIB and their representatives blended the line of a typical lender/borrower relationship and took on a fiduciary responsibility in the following ways: 1) Mr. Norling advised McTiernan to set aside a year of interest payments in the event of his incarceration. 2) Norling expressed to McTiernan multiple times that there would not be any issues extending the balloon payment date thus providing faulty assurances to McTiernan. 3) Norling advised McTiernan sign over his deceased mother's estate and that the monthly payments to FIB

would be increased by the amount McTiernan was then paying to the IRS. 4) Mr. Norling communicated to McTiernan incorrect advice regarding federal guidelines regarding note modifications. 5) Norling gave advice regarding market price standards and foreclosure deadlines. 6) Norling offered knowingly fraudulent advice regarding foreclosure procedures and who would receive equity in the ranch.

185.    The representations set forth above and affirmations of fact by the Defendants and the facts that the Defendants concealed or failed to disclose, are material facts that were likely to deceive reasonable consumers, and reasonable consumers would, and the Plaintiffs did, rely on when deciding whether to continue to pledge additional collateral and continue to pay exorbitant fees.   Moreover, the Defendants intended for consumers, including Plaintiffs, to rely on the material facts.

186.    The Defendants had exclusive knowledge of their intent not renew McTiernan's line of credit and failed to disclose a previous relationship with the Ranch appraiser and RMA. Additionally, the Defendants advised McTiernan with incorrect information and strung him along to perpetrate their scheme. These aforementioned facts gave rise to a duty to disclose those facts. The Defendants breached that duty by failing to disclose those material facts.

187.    Had McTiernan known of the Defendants' intention not to renew the line of credit, or the reasons behind the drastic increase in interest he would not have continued to follow Defendants' unsolicited advice and continue to adhere to the Defendants' extortionist demands.

188.    As a direct and proximate result of the Defendants' actions McTiernan has suffered ascertainable loss and other damages.

## COUNT ELEVEN
### (Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(b))

**189.**    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

**190.**    McTiernan brings this claim alleging violations of the Racketeer Influenced and Corrupt Organizations statute ("RICO"), 18 U.S.C. § 1962.

**191.**    McTiernan is a "person" who has been damaged in his "business or property" by reason of Defendants' violations of RICO, within the meaning of 18 U.S.C. § 1961(3).  As such, Plaintiff has standing to bring this claim.

**192.**    The Defendants are each "persons" as that term is defined in U.S.C. § 1961(4).

**193.**    RICO provides that "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1964(b).  As alleged herein, the Defendants violated 18 U.S.C. § 1964(b) by exerting control of McTiernan's mortgage and financials through a pattern of extortion and fraud.  The methodology of the scheme to defraud is set forth above and is described in this claim.

**194.**    For purposes of this Count, Defendants undertook a scheme to acquire an interest in and control of the Ranch through the use of false and misleading statements and omissions relating, inter alia, to their assurance that the line of credit would be renewed, through the use of U.S. mails and interstate wire facilities.  Further, the Defendants took an interest in and control of the Ranch through extortion and continuous use of economic fear and coercion.

**195.**    At all relevant times and as described above, Defendants carried out their scheme to defraud and extort McTiernan to acquire and maintain an interest in the Ranch, and the Ranch is an "enterprise" as the term is defined in 18 U.S.C. § 1961(4).

196.    Thea association-in-fact who took control of the Ranch Enterprise consisted of the following RICO persons, who constitute an "association-in-fact enterprise" within the meaning of RICO and who collectively constitute the "Ranch Enterprise":

A.   **FIB**: used its banking enterprise to obtain security interests in the Ranch for the sole purpose of foreclosing the land to put the land in control of the Scotts and to use the ranch to contribute to the FIB racketeering activities.

B.   **Norling**: as an officer of FIB, sold loans to parties with the purpose of obtaining security interests in the ranching properties for the sole purpose of later foreclosing and obtaining control of the ranching properties for the Scotts and specifically worked this scheme with regard to the Ranch.

C.  **RMA**:  marketed ranching properties for FIB with the sole purpose of limiting marketing so one of the members of the Ranch Enterprise would be able to purchase the ranching properties at a below-market price, including the Plaintiff's Ranch.

D.  **Ross Matthews**:  purchased properties for or with the Scotts for the purpose of consolidating ranching lands in their collective control, including the Plaintiff's Ranch.

E.  **The Scotts**:  operate FIB for the purpose of obtaining lands, including Plaintiff's Ranch for their personal gain or that of their partner in the RICO enterprise, Ross Matthews.

197.    The Ranch Enterprise, whose activities affected interstate and foreign commerce, was acquired by the association-in-fact of corporate entities and individuals within the meaning of 18 U.S.C. § 1962(b) and consists of entities and an individual associated together for the common purposes of foreclosing ranch lands in order to consolidate ranch land holdings at a discounted price in Wyoming and the surrounding states.

198.     The Ranch Enterprise was formed and existed at all times material to the allegations in this Complaint.

199.     The Ranch Enterprise and their respective officers and employees, acting together, developed the scheme to defraud and extort control of the McTiernan Ranch by wrongfully advising McTiernan on managing financial resources, misleading McTiernan as to their intentions about credit renewal, imposing unqualified appraisers without proper disclosure as to previous relationships to appraise McTiernan's assets, forcing McTiernan to hire a relator closely aligned with FIB, forcing McTiernan to pay exorbitant fees to the Lenders, forcing McTiernan to pay additional interest not contemplated under the loan facilities, and ultimately attempting to force the Ranch Enterprise into liquidation causing a windfall to the Defendants.

200.     In furtherance of the scheme, Ranch Enterprise acquired control of the McTiernan Ranch by engaging in multiple of acts and mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, which constitute a "pattern of racketeering activity," as the term is defined in 18 U.S.C. § 1961(5).

201.     Those acts of mail and wire fraud include, but are not limited to, continual making of false and misleading representations to McTiernan, described earlier, representing that any equity resulting in a sale at foreclosure would belong to FIB, as well as communications among the Ranch Enterprise with respect to the scheme to never fulfill their representations to McTiernan that his line of credit would be renewed allowing FIB to control the McTiernan Ranch to allow the Defendants to continue to  extort "fees" and exorbitant interest from McTiernan and eventually liquidate the McTiernan Ranch as a going concern while continuing to accrue fees and interest (including default interest) concluding with a windfall to FIB and Ross Matthews.

202.     Specifically, and without limitation, acts of wire and mail fraud include:

**A.**     A telephone conversation in early 2011 in which Norling, on behalf of FIB,

**B.**     Advised McTiernan that he if reserved 1 year of interest payments on the loan, the bank would renew his loan upon similar terms and conditions and would not declare a default in the event of his incarceration (wire fraud);

**C.**     An e-mail communication on or about February 3, 2011 in which Norling, on behalf of FIB, confirmed the information above (wire fraud);

**D.**     A telephone conversation in November 2011 in which Norling, on behalf of FIB, again advised McTiernan that his loan would be extended for a similar term and on similar terms (wire fraud);

**E.**     A telephone conversation early 2012 in which Norling, on behalf of FIB, again represented to McTiernan that McTiernan's loan would be renewed on similar terms (wire fraud);

**F.**     An e-mail communication on or about February 14, 2012 in which FIB, through Norling, agreed to renew McTiernan's loan, provided McTiernan sign over his deceased mother's estate and increase his monthly payments (wire fraud);

**G.**     A telephone conversation on or about June 2012 in which Norling falsely stated that FIB could not renew or extend the loan because "federal guidelines" did not permit McTiernan's loan to be extended (wire fraud);

**H.**     A telephone conversation on or about December 17, 2012 in which Norling demanded a $7,795.10 payment in order not to foreclose. (wire fraud);

**I.**     An e-mail communication on or about March 18, 2013 between Norling, on behalf of FIB, and McTiernan's wife, Gail Sistrunk, demanding an additional $140,000 to avoid foreclosure (wire fraud);

**J.**     An e-mail communication on or about August 15, 2013 from Norling, on behalf

of FIB, demanding McTiernan sign over additional unencumbered nearby real estate parcels in order to avoid foreclosure (wire fraud).

203.    The above list is not exhaustive but merely demonstrative of the efforts made by FIB to mislead McTiernan, tie up all his cash and assets and leave him with no ability to refinance.

204.    In furtherance of the scheme, the Defendants acquired control of the McTiernan Ranch through acts of extortion, in violation of 18 U.S.C. § 1951, each which constitute "racketeering activity," as the term is defined in 18 U.S.C. § 1961(1).

205.    Those acts of extortion include, but are not limited to, continually threatening the McTiernan Enterprise, as described above, that if McTiernan did not accept Matthews offer, FIB would foreclose and keep almost $5,000,000 of McTiernan's equity.

206.    As a direct result of the foregoing violations of 18 U.S.C. §1962(b), Plaintiff has been injured in his business and his property in multiple ways, including that he was stripped of the control of his business and the way it was operated, forced the Enterprise to forego business opportunities or alternative financing as McTiernan was assured his loan would be renewed; and force McTiernan to hire an ill-equipped appraiser with undisclosed ties to FIB as well as a disobedient relator who acted pursuant to FIB's scheme.

207.    But for the predicate acts described above – false and misleading statements sent via U.S. mail and interstate wire facilities and persistent extortion – the Ranch Enterprise would not have been able to gain control of the McTiernan Ranch and force McTiernan to pay exorbitant fees and interest, pledge unnecessary collateral, hire unnecessary appraisers and relators, and forego alternative financing.

208.    The RICO violations described herein have directly and proximately caused injuries and damages to Plaintiff, and Plaintiff is entitled to bring this action and recover three

times his actual damages, as well as equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. 1964(c).

## COUNT TWELVE
### (Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))

**209.**     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

**210.**     McTiernan brings this claim alleging violations of the Racketeer Influenced and Corrupt Organizations statute ("RICO"), 18 U.S.C. § 1962(c).

**211.**     McTiernan is a "person" who has been damaged in his "business or property" by reason of Defendants' violations of RICO, within the meaning of 18 U.S.C. § 1961(3).  As such, Plaintiff has standing to bring this claim.

**212.**     The Defendants are each "persons" as that term is defined in U.S.C. § 1961(4).

**213.**     RICO provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1964(c).  As alleged herein, the Defendants violated 18 U.S.C. § 1964(c) by exerting control of McTiernan's mortgage and financials through a pattern of extortion and fraud.  The methodology of the scheme to defraud is set forth above and is described in this claim.

**214.**     The Defendants violated by 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Lender Enterprise through a pattern of racketeering activity by defrauding McTiernan and extorting thousands of dollars in fees and ultimately by taking away his home (the

Ranch).  The methodology of their scheme is set forth in this Complaint and is described in this claim.

215.    For the purposes of this RICO claim, FIB coupled with Ranch Marketing Associates, LLC undertook a fraudulent scheme to seize real estate as collateral for a loan by driving McTiernan into default, while continuing to represent to McTiernan that the they would renew his line of credit despite their intention to never renew. Through the use of false and misleading statements and omissions relating to the existence of FIB's intent to renew the line of credit, FIB utilized the use of U.S. mails and interstate wire facilities. Subsequently, FIB capitalized on that fraud by refusing to release lines of credit to McTiernan without any explanation. Further, Defendants used their position of power and control over McTiernan to extort thousands of dollars in incorrect interest payments from McTiernan. Additionally, FIB threatened that they would be able to keep all equity in a foreclosure sale unless McTiernan sold the Ranch pursuant to FIB's instruction.

216.    At all relevant times as described above, the Defendants carried out their scheme to defraud and extort funds and property interest from McTiernan in connection within the conduct of an "Enterprise," as the term is defined in 18 U.S.C. § 1961(4).

217.    The Lender Enterprise consisted of the following persons or entities:  FIB, Marlin Norling, Ranch Marketing Associates, LLC, Ross Matthews, and others yet to be determined, who constitute an "association-in-fact enterprise" within the meaning of RICO and who collectively constitute the "Lender Enterprise."

218.    The Lender Enterprise, whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities, within the meaning of 18 U.S.C. 1962(c), and consists of persons associated together for the common purposes of: (a) extending

40

credit to McTiernan; (b) fraudulently inducing a lending relationship in order to obtain real estate collateral from McTiernan; (c) extorting, through economic fear and coercion, excessive funds from McTiernan by threatening to foreclose, liquidate and/or further harm McTiernan's financial standing.

219.     FIB and its officers, agents and employees, including but not limited to Norling and Matthews as well as Ranch Marketing Associates, LLC, controlled the Lender Enterprise and together developed the scheme to defraud and extort McTiernan and developed the false and misleading information in regard to the Ranch Loan, appraisals, foreclosure consequences and the possibility of a credit renewal.

220.     The Lender Enterprise was formed in about 2011 and continued at all times relevant to this Complaint.  The actions of the Lender Enterprise constitute a continuing course of conduct and continued until 2016 when the Ranch was ultimately obtained at a depressed value by Matthews.

221.     The Lender Enterprise was separate and distinct from the racketeering activity.  The Lender Enterprise was an ongoing organization or group and existed to advance the interests of the individual entities that comprise its membership, i.e., providing credit and related banking services or real estate related services.  The members of the Lender Enterprise served their common purpose of extending credit to Borrowers and maximizing their own profits and revenues and the bounty derived from defrauding and extorting McTiernan.  Each member of the Lender Enterprise benefited from the common purpose:  The Lenders received more interest and fees than they otherwise would have, had the Lenders abided by their obligations; the Lender Enterprise charged a higher rate of interest as well as exorbitant fees as a result of their fraud and extortion, thereby earning more profits than it would have otherwise.

**222.** At certain times, the Lender Enterprise existed for the legitimate purpose of extending credit and earning interest on said credit transactions.

**223.** Alternatively, the Lender Enterprise was formed solely for the purpose of carrying out the scheme and the pattern of racketeering activity described herein.

**224.** Through the conduct of the Lender Enterprise, the Defendants, FIB, Marlin Norling, and Ranch Marketing Associates, LLC, undertook a scheme to defraud and extort funds and seize property from McTiernan based on false and misleading misrepresentations and omissions set forth herein.

**225.** In furtherance of the scheme, the Defendants engaged in acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, each which constitute "racketeering activity," as the term is defined in 18 U.S.C. § 1961(1).

**226.** Those acts of mail and wire fraud include making false and misleading representations to McTiernan and/or Gail Sistrunk (holding Power of Attorney for McTiernan), described earlier, representing that FIB intended to renew McTiernan's line of credit, as well as communications among the "persons" comprising the Lender Enterprise with respect to the scheme to defraud via interstate e-mail and telephone with the common purpose of defrauding McTiernan, collecting additional real estate collateral (the Ranch) and extorting "fees" and exorbitant interest from McTiernan.

**227.** In furtherance of the scheme, the Defendants engaged in acts of extortion, in violation of 18 U.S.C. § 1951, each which constitute "racketeering activity," as the term is defined in 18 U.S.C. § 1961(1).

**228.** Those acts of extortion include, inter alia, continually threatening McTiernan, as described herein, that the Lender Enterprise would usurp all the equity from the Ranch should it

be sold in foreclosure unless they sold the property to Matthews and continue to make exorbitant interest payments to the Lenders and comply with the Lender Enterprise's scheme to seize control of all the Ranch's assets, despite the fact that McTiernan had been reassured his credit would be extended at the end of the term.

229.    As direct result of the foregoing violations of 18 U.S.C. 1962(c), McTiernan has been injured in his business and property in multiple ways, including that he was forced to pay exorbitant interest rates for years, sell his mother's estate to provide payments, forced to sell his property.

230.    But for the predicate acts described above – false and misleading statements sent via U.S. mail and interstate wire facilities and persistent extortion – McTiernan would not have (mothers estate, entered into loan agreement, set aside years' worth of payments) or continued to pay extortionist fees or would have found alternative financing for the real estate at a commercially reasonable rate and a commercial reasonably debt/equity ratio and used said funds to pay the Lender Enterprise those amounts which the Lender Enterprise was duly owed.

231.    The RICO violations described herein have directly and proximately caused injuries and damages to McTiernan, and McTiernan is entitled to bring these actions for three times their actual damages, as well as equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

**A**.    On the Breach of Contract Claim (First Count), damages against FIB and RMA;

**B**.    On the Economic Duress Claim (Second Count), damages against FIB and Norling;

**C**.    On the Breach of Fiduciary Duty Claim (Third Count), damages against FIB, Norling and RMA;

**D**.      On the Accounting Claim (Fourth Count), an order directing FIB to provide a complete accounting: of all funds paid by McTiernan to the alleged obligations on the revolving line of credit and the allocation of those payments along with any amounts charged against the revolving line of credit by FIB at any time;

**E**.      On the Breach of the Implied Covenant of Good Faith and Fair Dealing Claim (Fifth Count), damages against FIB, Norling and RMA;

**F**.      On the Tort of Bad Faith Claim (Sixth Count), damages and punitive damages against FIB and Norling;

**G**.      On the Fraudulent Concealment Claim (Seventh Count), damages, and punitive damages against FIB and Norling;

**H**.      On the Intentional Misrepresentation Claim (Eighth Count), damages against FIB and Norling;

**I**.      On the Negligent Misrepresentation Claim (Ninth Count), damages against FIB and Norling;

**J**.      On the Unfair Trade Practices and Consumer Protection Act Claim (Tenth Count), damages, and punitive damages against FIB and Norling;

**K**.      On the RICO Claim (Eleventh Count), damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1962(b) against FIB, Norling and RMA;

**L**.      On the RICO Claim (Twelfth Count), damages, treble damages, costs, and attorneys; fees pursuant to 18 U.S.C. § 1962(c) against FIB, Norling and RMA;

**M**.      On all Claims, attorneys' fees, costs, and pre-judgment interest; and

**N**.      For such further relief as the Court deems just, proper and equitable.

Dated: September 10, 2018

## JURY TRIAL DEMAND

**Plaintiff hereby demands a trial by jury as to all matters so triable.**

Dated: September 10 2018

Scott B. Johnson
/s/ Atty.
Bar # 42375258
P.O. Box 223
402 Mineral Ave. #1
Troy, Montana 59935
Johnsonsb@netzero.com
419.348.0516


Brian H. Mahany
MAHANY LAW
P.O. Box 511328
Milwaukee, Wisconsin 53203
(414) 223-0464
brian@mahanylaw.com
*Pro Hac Vice Pending*


Corey Spearman, Esq
Barnes Law LLP
601 South Figueroa Street, Suite 4050
Los Angeles, CA 90017
310.510.6211
coreyspearman@barneslawllp.com
*Pro Hac Vice Pending*